IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2024

## STATE OF TENNESSEE v. MATTHEW F. BEASLEY

**Appeal from the Criminal Court for Macon County**
**No. 2017-CR-174    Brody N. Kane, Judge**

_____

### No. M2023-00419-CCA-R3-CD

_____

Defendant, Matthew F. Beasley, appeals the trial court's order revoking his probationary sentence for aggravated assault and ordering him to serve the balance of his ten-year sentence in confinement. Following our review of the entire record and the briefs of the parties, we find no abuse of discretion and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Mitchell A. Raines, Assistant Public Defender Appellate Division (on appeal); and Joe McLerran, Assistant Public Defender (at revocation hearing), for the appellant Matthew F. Beasley.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Jason L. Lawson, District Attorney General; and William A. Calla, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

On June 14, 2021, Defendant pled guilty to one count of aggravated assault as a lesser included offense of attempted first degree murder and one count of false reporting, and was sentenced to ten years for the aggravated assault and four years, time served for false reports to run consecutively; thus, his probationary sentence was ten years. As special conditions of probation, Defendant was to have no contact with the aggravated assault

victim, and was ordered to "seek mental health treatment within thirty days of release" and "provide probation with continuing proof of such treatment."

On July 8, 2022, a probation violation warrant was issued against Defendant alleging that he had been arrested July 7, 2022, and charged with aggravated criminal trespass in Macon County. Defendant was detained at the Macon County Jail pending disposition of the new charges and the probation violation. On December 12, 2022, based upon an affidavit from the Macon County Sheriff, the trial court ordered Defendant to be transferred to the Tennessee Department of Correction ("TDOC") because "the psychological disorder of [D]efendant render[ed] the Macon County Jail insufficient to safely house [D]efendant" or provide treatment for him.

On February 28, 2023, the trial court conducted a probation violation hearing. Mr. Jacob Vance worked for TDOC and had supervised Defendant since Defendant began probation after pleading guilty on June 14, 2021. Mr. Vance testified that on June 30, 2021, two weeks after Defendant was released from jail, Mr. Vance sought a warrant for a probation violation when Defendant was charged with domestic assault. Defendant had not had enough time to undergo the required mental health evaluation before picking up the new charges. On that prior violation, Defendant was incarcerated from June 16, 2021, through April 25, 2022, and then reinstated to probation with the condition that he attend and complete a mental health treatment program.

Defendant was released to a mental health facility, but "they released him within maybe a day or two, and said they couldn't, they'd done all they could do or couldn't handle him or something like that." Defendant was living in a hotel and reported to Mr. Vance "twice in May, once in June and once in July[.]" During that time, Defendant did not complete a mental health evaluation, but "he may have had one scheduled in October." Defendant's drug screens during that time were negative, and he "was compliant" until his arrest on July 7, 2022. Mr. Vance agreed that Defendant's arrest for aggravated criminal trespass was the sole basis for Defendant's new violation.

Kim Beasley Martin, Defendant's mother, testified that she had problems with Defendant since he was "around 14 or 15" for "[d]rinking charges, fighting charges, a lot of assaults[.]" Defendant lived with Ms. Martin until his first incarceration. When Defendant was released, Ms. Martin was out of town and told Defendant's grandfather to take him to her house until she got home. At her home, Defendant "just kicked [his brother] in the head, started hitting on him. So, that's why he violated that time." The second time Defendant was released, Ms. Martin drove him to a treatment facility in Cookeville. When Defendant was released, she did not feel comfortable allowing Defendant to stay with her, so she paid for him to live at the Budget Inn from April 2022 until July 2022. She stopped paying when it became too expensive. During that time, Defendant was taking his

medicine for schizophrenia "for two, maybe three weeks, until he started first not taking the do[se] he was supposed to. And then, not taking it at all." Ms. Martin recalled that while Defendant was on probation, she had invited him to her house without incident.

On July 6, 2022, Ms. Martin was on her way to tell Defendant that she could not afford to continue to pay for his room at the Budget Inn when she learned that "some people pulled strings" to get Defendant into Haven House. She "thought that would be the perfect thing, because he would stay there for about a year. They gave him his medicine, so he had to take his medicine. They would provide him with a job, [so] he could work and learn how to get back into society." Defendant agreed to remain at Haven House and take his medicine. Ms. Martin told Defendant this was his "very last chance. I didn't know what else that I could do. I had done everything and that he couldn't come back home with me, because I was afraid for him to live with me. And he stayed there less than [twenty-four] hours. And he left on foot."

Defendant walked from Haven House to Ms. Martin's house. Ms. Martin was home with her other son when Defendant "knocked a lot of times[,]" but "[i]t was at night, so we didn't answer the door. And the next thing I know, he's coming through the window, where the air conditioner was in the back, and coming through the house." Defendant "wasn't violent . . . [but] he's okay until he's not okay. And … you don't know when that's going to be. He was just begging to stay there." Ms. Martin called the police about fifteen minutes into the incident.

Ms. Martin did not think that jail was where Defendant needed to be but was not sure where he needed to go to get the appropriate help. He could not stay with her and he had no job and was thus unable to pay rent anywhere. According to Ms. Martin, "[Defendant] can't keep a job, because he won't take his medicine." She explained that if Defendant continued to take his medicine he would be okay, "[b]ut people with schizophrenia get to a point, when they start to feel better, that's usually the point, they don't take their medicine anymore. And we've been through this numerous, numerous times."

Defendant testified at the hearing and said that his relationship with Ms. Martin was "decent." He explained that he went to Ms. Martin's house because he felt "threatened slightly" at Haven House because "they had confidential informants[.]" Defendant also thought there were confidential informants at the hotel. He thought he was "somewhat" welcome at Ms. Martin's house but "[s]he wanted me to stay at the [Haven House], so she said, you're supposed to stay at the [Haven House]. But it wasn't that I was completely unwelcome. It was just she said, I had somewhere else for you to stay." He agreed that he did not have a place to live if he were released but "would try to find one pretty fast." He

also agreed that he would take his medicine and comply with the terms of probation if released.

After hearing all of the testimony, over multiple interruptions by Defendant, the trial court found by a preponderance of the evidence that Defendant had violated the specific terms of his probation by not completing the mental health requirements of his probationary sentence and by his arrest on new charges. The trial court stated:

I have told you and asked you to take your medication over and over and over again, and you always tell me you will. And then, you get out and you don't. And [Defendant], I'll be honest with you, when I let you out the last two times, this is the kind of case that keeps me up at night, because I never know what you're going to do. And . . ., I'm dependent on you taking your medicine. And you will not keep taking it.

* * *

[J]ail is probably not the best place for you. But I'm out of ideas. I, I have to have your cooperation, and . . . you have proven, you will not do it.

So, my only . . . recourse, I've already given you nearly a year on the last violation, I'm just going to have you do your ten years . . . . Maybe when you get out, after doing a significant stint, you'll learn that you've got to take your medicine and leave these folks alone.

Defendant filed a timely notice of appeal.

**Analysis**

Defendant claims that the trial court erred by ordering him to serve the balance of his sentence in confinement because "prison is clearly an inappropriate consequence for mental health issues[.]" The State argues that the trial court properly exercised its discretion when it found that Defendant violated his probation and that confinement was the appropriate consequence for the violation. We agree with the State.

We review a trial court's decision to revoke probation for an abuse of discretion with a presumption of reasonableness "so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." *State v. Dagnan*, 641 S.W.3d 751, 759 (Tenn. 2022). While a trial court's findings are not required to be lengthy, they must be "sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Id.* "In order for a reviewing court to be

warranted in finding an abuse of discretion in a probation revocation case, it must be established that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." *State v. Farrar*, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011) (quoting *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn. 1991)); *see State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980); *see also State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) ("A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010))).

A trial court must engage in a "two-step consideration" when determining whether to revoke a defendant's probation. As explained by the Tennessee supreme court, "[t]he first [step] is to determine whether to revoke probation, and the second is to determine the appropriate consequence upon revocation." *Dagnan*, 641 S.W.3d at 757. If a trial court finds by a preponderance of the evidence that a defendant violated his or her probation, then it is within the trial court's discretionary authority to revoke the defendant's probation. T.C.A. § 40-35-311(e)(1), (2); *Dagnan*, 641 S.W.3d at 756; *State v. Beard*, 189 S.W.3d 730, 734-35 (Tenn. Crim. App. 2005).

Once a trial court decides to revoke a defendant's probation, it must then determine the appropriate consequence of the revocation. *Dagnan*, 641 S.W.3d at 756. The trial court may "impose one of several alternative consequences: (1) order incarceration for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period by up to two years; or (4) return the defendant to probation on appropriate modified conditions." *State v. Daniel*, No. M2021-01122-CCA-R3-CD, 2022 WL 6644369, at *2 (Tenn. Crim. App. Oct. 11, 2022) (quoting *Dagnan*, 641 S.W.3d at 757). When considering the consequence of a revocation of probation, a trial court may consider "the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character." *Dagnan*, 641 S.W.3d at 759 n.5.

Defendant argues that the trial court did not place sufficient findings on the record to support a full revocation of Defendant's ten-year sentence and failed to adequately consider any alternative penalties when mental health treatment, not prison, would best serve the interests of society and Defendant. The State argues that the trial court properly exercised its discretion when it considered Defendant's repeated violations, refusal to comply with conditions of release, and committing a new offense. We agree with the State.

Regarding the first *Dagnan* consideration, Defendant does not contest the trial court's finding that Defendant violated his probation. Moving to the second *Dagnan* consideration, the trial court explicitly stated on the record its reasoning for finding that

confinement was the appropriate consequence for Defendant's violation. Thus, the applicable standard of review is abuse of discretion with a presumption of reasonableness. Defendant argues that the trial court failed to meet its obligation to consider mental health treatment as an alternative form of punishment. The trial court considered alternative forms of punishment when it noted that it had twice before granted Defendant alternative forms of punishment, which included mental health treatment. The trial court also considered and noted that any alternative to incarceration was dependent on Defendant's taking his medication, which Defendant had promised the court "more than once in open court" but had proven "over and over and over again" that he could not, or would not, do. The trial court also considered Ms. Martin's testimony that she had tried to help Defendant, noting, "she's done what she can, and you can only do so much." The evidence at the hearing was clear that twice when Defendant had been released from custody, he was arrested for committing new offenses within a few weeks each time. "'[A]n accused, already on probation, is not entitled to a second grant of probation or another form of alternative sentencing.'" *State v. Shelton*, No. E2022-00875-CCA-R3-CD, 2023 WL 2261081, at *3 (Tenn. Crim. App. Feb. 28, 2023), *perm. app. denied* (June 29, 2023) (quoting *State v. Warfield*, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999)); *State v. Brumfield*, No. M2015-01940-CCA-R3-CD, 2016 WL 4251178, at *3 (Tenn. Crim. App. Aug. 10, 2016); *State v. Johnson*, No. M2001-01362-CCA-R3-CD, 2002 WL 242351, at *2 (Tenn. Crim. App. Feb. 11, 2002). The trial court properly considered, and rejected, alternative forms of punishment before ordering Defendant to serve his remaining sentence incarcerated.

Contrary to Defendant's assertion, the record establishes that the trial court did consider the best interests of both Defendant and the community. *See State v. Mitchell*, 810 S.W.2d 733, 736 (Tenn. Crim. App. 1991) ("We agree that a revocation decision is best tested by whether such an action would serve the ends of justice and be in the best interest of both the public and the defendant[.]). This court will not require "a trial court [to] include specific phraseology in its ruling." *State v. Doxtater*, No. E2023-00261-CCA-R3-CD, 2023 WL 8319200, at *6 (Tenn. Crim. App. Dec. 1, 2023), *no perm. app. filed*. The trial court noted Defendant's prior refusal to take his medication and remain compliant with the terms of his probation and the laws of Tennessee. Defendant also testified at the hearing that he was jobless and did not have a place to live if he were released. Similarly, while the trial court stated its belief that "jail is probably not the best place for you[,]" it also noted its hope that Defendant would learn to take his medication while incarcerated for a longer period of time. Further, the trial court expressed concern for the community if Defendant were reinstated to probation because "this is the kind of case that keeps me up at night, because I never know what you're going to do."

Based on the record, we conclude that the trial court did not abuse its discretion in ordering Defendant to serve the balance of his ten-year sentence in confinement after

finding that Defendant violated the terms and conditions of his probation. Defendant is not entitled to relief.

## CONCLUSION

For the forgoing reasons, we affirm the judgment of the trial court.

_____
JILL BARTEE AYERS, JUDGE